WHITE v. WHITE.

4-5045

Opinion delivered April 25, 1938.

*Robert C. Knox,* for appellant.

*Walter L. Brown* and *Wayne Jewell,* for appellee.

GRIFFIN SMITH, C. J. This appeal is from a decree of the Union chancery court wherein appellee, Dr. D. E. White, was granted an absolute divorce from appellant on the ground that "the parties have lived separate and apart for more than three years prior to the filing of the complaint."

By act 167 of 1937, § 3500 of Crawford & Moses' Digest, was amended to read: "Divorce from the bonds of matrimony may be obtained, in addition to the causes now provided by law, and subject to the same procedure and requirements, for the following cause: When the husband and wife have lived apart for three consecutive years without cohabitation the court shall grant an absolute decree at the suit of either party."

On cross-examination Dr. White was asked: "Wasn't the real reason why you left home, and why you continued trying to get a divorce—isn't it because you are enamored of another woman, and you want a divorce from Mrs. White so you can make this other woman your wife?"

There was this objection: "We object to that because it has no place in this suit. We are relying upon the Kentucky case in which it says it makes no difference whose fault it was; if they have been living apart that is the only pertinent thing. . . . In the Wisconsin case it was held that the family skeleton should not be·brought out before the public."

The objection was overruled, and exceptions saved.

Appellant and appellee were married in 1919 and lived together until 1934. They have one child—a daughter—who was six years old at the time the complaint was filed in August, 1937. Appellee, who is a prominent physi-

cian and surgeon of El Dorado, alleged that his income was $3,852.61, and that he was the owner of certain real property, descriptions of which are set out. He asked that one-third of his property be decreed to appellant, and that the court determine what alimony should be paid from appellee's net income. It was further alleged that appellee had already made provision through life insurance for the education of the child, and that he "wishes to support and care for said child until she reaches her majority and has finished her education."

The only ground urged for divorce was that the parties had not resided together nor cohabited as man and wife for more than three years.

Appellant's answer admits that she and appellee lived together until August 13, 1934. She alleged that "on or about the 13th day of August, 1934, Dr. D. E. White, without any just cause therefor, left the marital domicile of the parties in the city of El Dorado, Arkansas, and removed to the Mitchell Hotel in said city, where he has since maintained his residence, but this defendant states that said removal by the said D. E. White was without the knowledge and consent of this defendant, and that the said D. E. White has since said time maintained his residence in said hotel against the consent of said defendant, and over her protests and entreaties that he should return to the home and live with her as her husband. That during all said time this defendant has been willing to live with said plaintiff as his wife, and that she has repeatedly so informed the plaintiff, and has repeatedly urged him to return, and that the so-called separation between the plaintiff and defendant has been the voluntary act of the plaintiff, and that this defendant has at no time consented nor acquiesced therein."

Appellant challenged correctness of appellee's statement that his income was only $3,852.61, and alleged that such income was $12,000 per year.

Further, by way of defense, appellant alleged:

"That plaintiff's cause of action, if any, is founded upon a certain purported act of the General Assembly of the state of Arkansas for the year 1937, designated as act 167 and entitled 'An Act to Amend § 3500 of Craw-

ford & Moses' Digest of the Statutes of the State of Arkansas.'

"Plaintiff says that said act is invalid and of no effect for the following reasons, to-wit:

"1. That said act undertakes to impair the contract between the plaintiff and the defendant in violation of art. 1, § 10, of the Constitution of the United States.

"2. That said act seeks to deprive this defendant of her dower and homestead rights in the property of the plaintiff without due process of law in violation of § 1, of the 14th amendment to the Constitution of the United States, and § 8, art. II, of the Constitution of the state of Arkansas.

"3. That said act was not properly adopted by the General Assembly of the state of Arkansas and is, therefore, not a valid law because:

"a. Same was not styled, introduced and passed as a 'Bill' as required by § 21, art. V, of the Constitution of the state of Arkansas.

"b. That said purported act was not read at length on three different days in each house, nor were the rules suspended by two-thirds vote of each house as required by § 22, art. V, of the Constitution of the state of Arkansas.

"c. That the vote of yeas and nays upon the final passage in each house was not taken as required by § 22, art. V, of the Constitution of the state of Arkansas.

"d. That the names of the persons for and against said purported act were not entered on the journal of each house as required by § 22, art. V, of the Constitution of the state of Arkansas.

"e. That majority of each house did not vote in favor of said proposed act and are not recorded in the journals of each house as having so voted in favor thereof as is required by § 22, art. V, of the Constitution of the state of Arkansas.

"f. That said proposed act was originally introduced in its present form in the house of representatives, that it was amended in the senate and adopted by the senate as amended, but that the house of representatives never at any time concurred in said amendment or voted

thereon or adopted said bill as amended, and that, therefore, said purported act as signed by the Governor was not the same act as adopted by each of the houses of the General Assembly.

"g. That the subject and purpose of said purported act was not clearly set forth in the title thereof as is required by the Constitution of the state of Arkansas.

"h. That said purported act violates § 24, art. V, of the Constitution of the state of Arkansas in that it seeks to grant divorces by legislative fiat in violation of said section and article."

Dr. White, in his direct examination, testified to facts in substantial conformity to declarations of his complaint. He denied that he had lived with appellant since the designated date of separation, or that they had cohabited. He also denied that appellant had visited him at the Mitchell Hotel, and asserted that the separation was final.

On cross-examination appellee testified that at the time he moved to the Mitchell Hotel Mrs. White was in Monticello.

"Q. At whose suggestion had she gone to Monticello?"

Counsel for appellee: "We object to that question for the reason it is immaterial under the statute. It is attempting to bring something into the evidence, or read something into the statute, that is not there, and I don't think we should go into that question."

The court permitted the question to be asked.

The witness then testified: "She went at my suggestion. Mrs. White and I had reached the boiling point in our married life, and we both realized we couldn't continue as things had been recently. I talked to Mrs. White and told her that if it was possible for our married life to continue we would have to live apart for a while, or a short time. I therefore suggested that she go to Monticello to visit her people and I remain in El Dorado. She knew that full well. . . . I brooded over it for several days and realized it was hopeless, and some four or five days after she had been away I moved—on the 13th day of August, 1934—to the Mitchell Hotel. At the time Mrs.

White left I didn't intend getting a divorce. .... After two or three days I caused a divorce suit to be filed and sent a summons to her at Monticello. Before I filed the suit I called her brother to meet me at Warren. After the summons was issued the sheriff at Monticello talked to her and she came back to El Dorado. The summons was served on her here."

"Q. Did Mrs. White urge you, at that time, to return home? A. Yes, sure she did."

Appellee further testified that at a later date Mrs. White went to his office and urged him to return.

Depositions in the divorce suit filed in 1934 were taken. Mrs. White testified, in 1936, that in spite of Dr. White's conduct and attitude she still loved him; that she was willing for him to return home; that she had no malice against him, and had demonstrated none.

Asked if he was familiar with the contents of his wife's deposition of 1936, Dr. White said: "I haven't contacted Mrs. White for the last three years, nor made any effort to go home."

At this point in the proceedings the objection, as set out in the fourth paragraph of this opinion, was interposed. Thereafter, counsel for appellant asked:

"Doctor, how long have you known Miss Vera Taylor? A. For six or seven years.

"Q. Miss Taylor is in the hospital where you do a good deal of your professional work? A. No. I do my practice at Warner Brown Hospital. She is a student nurse in the Robert Rosemond Hospital.

"Q. Since your separation from Mrs. White haven't you been paying pretty marked attention to Miss Taylor?"

There was this objection: "That has nothing to do with the separation. He has answered that he is not enamored with anyone, and now counsel is asking what happened after the separation."

The court's ruling was: "I don't think that competent. You are seeking to defeat this divorce on the grounds that he was at fault, and that it was plain at the time of the separation. Let the objection be sustained."

Counsel for appellant: "We offer to prove by this witness that since his separation from Mrs. White, beginning almost immediately after the separation—from that time he has been constantly paying court to Miss Taylor, taking her to various places. And we offer to prove by this witness that a few days after the separation Miss Taylor met him in Shreveport, Louisiana, and that they attended the World Series in St. Louis, and attended the Dallas Fair in 1936, and have been constantly together as two people paying attention to each other almost from the time of the separation until now."

The Court, addressing counsel for appellee: "Are you objecting to it? A. Yes."

The Court: "Then you are admitting he can prove that by the witness? A. We are objecting under this statute."

The objection was sustained and exceptions saved.

"Q. Now, as to the separation between you and your wife: when she went over to Monticello she was going on a visit to relatives—she was to be temporarily away on a visit at that time? A. Yes, for the reason I have stated before.

"Q. She never did, at any time, consent to the separation? A. I don't know."

It was shown that as to the divorce suit filed in 1934, a non-suit was taken over protests of the defendant.

Appellant testified: "I went to Monticello [in 1934] because Dr. White told me he wanted me to go there. He was very nervous and his health was bad. He said he needed to go to Hot Springs. I suggested that we all go, and he said, 'No, you take the baby and go to Monticello and let me go to Hot Springs for a rest.' There was no talk between us at that time as to our marital relationship, and I did not know there was any trouble. I knew Dr. White was nervous and I asked him to tell me what the matter was. He said his teeth were giving him trouble. We had not at any time before I left home discussed any difficulties, and I did not know of anything in my life, or in Dr. White's life, that would cause our relations to be strained. We had been married fifteen years and our married life had been happy up to the time

I went to Monticello. The first thing I knew about [his attitude] was when he called my brother to Warren and said he was suing for divorce. I immediately returned to El Dorado and went to our home on West Cedar street. Dr. White was not there. We tried to get in touch with him, but couldn't. My brother got in touch with him the next day and he came to see me. I asked him why he had done such a thing and he said he didn't know why. I then asked him if he had made up his mind before I left, and he said no. He gave me a hypodermic while he was there. . . . He came back that night and gave me a hypodermic. I talked to him again and asked if I had done anything to cause it, and if I had I was willing to correct it. He said it wasn't my fault; that I had been a good wife and mother. Later, one Sunday morning about six weeks after he left home, my brother and I went to Dr. White's office. I told Dr. White I wanted to speak to him privately, and he closed the door. I asked him to come back, and he said: 'No, I gave you fifteen years to make me happy, and you didn't.' I said, 'Doctor, that isn't true: when you found out we were going to have a baby you were the happiest man in the world.' He said that was true, and asked, 'How much have you found out about me.' ''

There were objections which were overruled, and further testimony of the same character.

. . . . . .

We are of the opinion that act 167 of 1937 was legally passed, and that it is retroactive. But we are also of the opinion that the chancellor misconstrued its purpose.

Section 3500 of Crawford & Moses' Digest was an enumeration of the grounds upon which a divorce might be obtained. Six separate grounds were set out. The seventh ground, created by the 1937 General Assembly, relates to separation for three years, referred to *supra*. The amending act re-enacts the six existing grounds, and then provides that "divorce . . . *may* be obtained . . . for the following causes: When the husband and wife have lived apart for three consecutive years without cohabitation the court *shall* grant an absolute decree of divorce at the suit of either party." (Italics supplied.)

We are concerned with the language of the statute, in that it first provides how a divorce *may* be procured, then by express terms directs that the court *shall* grant it.

This case was argued orally on appeal. In response to a question by one of the judges, counsel for appellee conceded, in substance, that if the law should be literally construed it would permit a husband to engage in misconduct of the vilest nature; he might beat and otherwise abuse his wife until self-preservation and self-respect compelled her to seek surcease and safety elsewhere; and yet, though the same bullying, belligerent, and cruel attitude, or the same gross misconduct, should be constantly in evidence—still, if through a process of physical and mental coercion, such husband can compel the wife to remain away for three years, he may serenely invoke the benefits of act 167 and by indirection accomplish an end that was never contemplated by those who make our laws.

It is argued that "times have changed"; that today's policy is to darken the family closet and keep its contents under lock and key; that society of the sexes demands freedom from restraint. This "individualism," it is urged in social dictum, must be extended to the home, with the right between men and women who took their marriage vows in the sight of Almighty God or under civil authority to insist upon reservations not previously expressed.

There is a custom, among young people, of making statements or giving promises with fingers crossed, but not until recently had it been thought that in this country such practice would be seriously considered as a qualification of the marriage obligation.

The point is made by counsel for appellant that there are three parties to a marriage contract—the husband, the wife, and the state. The husband and wife cannot, by mutual consent, dissolve the contract; but with consent of the state they may.

Counsel for appellant says:

"So careful have our courts been to maintain the interests of the state that they have repeatedly refused divorces where it appeared that there was collusion between the husband and the wife to obtain the decree. Now,

if act 167 is given its rightful place in our scheme of law it means this and only this, where the husband and the wife have mutually agreed to live separate and apart, and they have manifested a fixed intention .so to do by so living separate and apart without cohabitation for three years, then in that event the state withdraws its objection to. a divorce, and the parties may obtain a decree.''

Conversely, it is insisted by counsel for appellee: ''The legislature adopted a new and separate ground for divorce, the purpose of which was to eliminate the bringing of charges by one spouse against the other in order to procure a divorce, and has adopted as the public policy of this state a means whereby, after a long period of separation, either party may obtain a divorce without accusing the other under the grounds existing at the time of the adoption of act 167. The question as to who was the wrongdoer, in statutes similar to this, has been passed upon from time to time. Excepting the state of Washington, the courts uniformly hold that the question of who was the wrongdoer should not be considered in granting .or refusing the divorce. . . . A comparison of the separation statute of Nevada and act 167 of Arkansas shows them to be identical excepting the two points heretofore pointed. Unquestionably the legislature of Arkansas adopted the separation statute of the state of Nevada and the construction placed by the Supreme Court of Nevada upon the Nevada act will be followed by this court.''

Appellee directs attention to *White* v. *Taylor,* 187 Ark. 1, 58 S. W. 2d 210, for support of the proposition that this court, in construing statutes copied from a foreign state and adopted subsequent to construction by the Supreme Court of the foreign state, will presume that the General Assembly of this state adopted such statute as it had been construed. In the White case it was said: ''The language of the section of the statute relating to assessments was copied from the National Banking Act, which had been construed by the United States Supreme Court prior to the enactment of our statute, and such construction was necessarily adopted with it,''

This is a correct declaration of statutory construction, but the rule is not without an exception. In *St. Louis, Iron Mountain & Southern Railway Co.* v. *Kirtley,* 120 Ark. 389, 179 S. W. 648, we said: ''Where a statute is adopted from another state after being construed by the courts thereof, such construction will be adopted, if not in conflict with the settled policy of the state adopting the statute.''

Appellee contends that the Nevada statute and the Arkansas statute are identical except that in Nevada the period of separation as a prerequisite to divorce must be five years, and direction to the trial court in Nevada is that such court *''may at its discretion''* grant such divorce, while in Arkansas the word *''shall''* is employed.

While it is true that the Arkansas statute re-enacts § 3500 of Crawford & Moses' Digest, and in the re-enactment adds the seventh ground or cause for divorce, the purpose of complete re-enactment undoubtedly was to meet the requirements of art. 5, § 23, of our Constitution, which is: ''No law shall be revived, amended, or the provisions thereof extended or conferred by reference to its title only; but so much thereof as is revived, amended, extended or conferred shall be re-enacted and published at length.''

No changes having been made in § 3500 other than the added provision, such provision, in fact, is an amendment to the original law. Therefore, it can hardly be said that the General Assembly was consciously undertaking to enact the Nevada divorce law with the construction given by the Nevada Supreme Court.

In *State* v. *Sewell,* 45 Ark. 387, it was said: ''A statute is a fresh drop added to the yielding mass of the prior law, to be mingled by interpretation with it. In construing any statute we are to place beside it the other relevant statutes, and give it a meaning and effect derived from the combined whole. Where the harmony of the law requires it, one statute may be construed as lengthening out another.''

In an opinion of the Supreme Court of Washington, *Pierce* v. *Pierce,* 120 Wash. 411, 208 Pac. 49, written by Chief Justice PARKER, it was held that the statute in ques-

tion was available only to the injured party. Judge PARKER said:

"If the legislature desired to make living 'separate and apart for a period of five consecutive years or more' an absolute and unconditional cause for divorce, without regard to the fault or cause of such separation, why did it not say so, as it could easily and plainly have done in much fewer words than it used in subdivision 8? Again, why, if that was the legislative intent, did it not so express such intent in an independent section or act wholly disassociated with the other specified causes of divorce following the introductory sentence of the section? as has been done by the legislatures of two or three other states of the union, thus, according to the holdings of the courts of those states, effectually eliminating consideration of the question of fault or consent of either of the parties.

"The construction of subdivision 8 contended for by counsel for the plaintiff, it is plain, we think, would lead to this result: A husband could without any cause, other than his own vicious will, forcibly drive his faithful and devoted wife from their home, exclude her therefrom, and refuse to live with her for a period of 5 years, and then obtain a divorce from her solely because of such separation created by his own wrong. Or he could commit one or more of a number of conceivable acts grossly violative of his legal and moral marital duties, such as would effect the separation of his wife from him for a period of 5 years or more, wholly without her fault or consent, and at the end of such period of separation invoke the bare fact of separation and the law as it is here sought to be construed by counsel for the plaintiff, as an absolute and unqualified cause for the granting to him of a divorce.

"The passage of a statute in such language as to compel the courts to adopt such a construction or interpretation of it, leading to such results, would be a radical departure from the policy of our state expressed in its divorce statutes since the beginning of territorial days.

"The passage of such a statute, expressing a legislative intent such as is here contended for by counsel for the plaintiff, would also be a radical departure from what may be called the common law of divorce; that is, those

principles of the unwritten law of divorce supplemental to the statute law, universally recognized by the courts of this country as of controlling force, when applicable, except when plainly modified or abrogated by statute."

The rule of construction of an adopted or re-enacted statute laid down by 25 R. C. L., p. 1069, § 294, is: "When a statute has been adopted from another state or country, the judicial construction already placed on such statute by the highest courts of the jurisdiction from which it is taken accompanies it, and is treated as incorporated therein. . . . [But] the general rule . . . is by no means absolute, or imperative on the courts of the adopting state, but is subject to numerous exceptions. . . . So the rule has been declared to be inapplicable where radical or material changes are made in the statute; . . . where the foreign construction . . . is contrary to the policy of the jurisprudence of the adopting state; where the courts of the adopting state are clearly of the opinion that the foreign construction is erroneous, or that its application would lead to a denial of substantial rights."

In Annotated Cases, 1917B, a note at page 654 is: "The rule that the adoption of a foreign statute carries with it the prior construction in the originating state has been held to be applicable only where the terms of the statute are of doubtful import, so as to require construction. Thus it has been held that the rule is not applicable where the meaning of the statute is too plain to make it necessary to seek the meaning placed on the statute by the courts of the originating state. Where there is a material variance between the original and the adopted statute, the courts of the adopting state will not follow the construction of the courts in the originating state."

In one of the cases cited in the note it is said: "To adopt the construction given by an extra-territorial court to an act subsequently adopted in another state, so that the construction thus given may be read into the act as a part of it, the statute must appear to be the same in its entirety." *Public Service R. Co.* v. *Board of Public Utility*, 81 N. J. L. 363, 80 Atl. 27.

In *Dicken* v. *Missouri Pacific Railroad Company*, 188 Ark. 1035 (at page 1039), 69 S. W. 2d 277, Chief Justice

JOHNSON, speaking for the court, said: "It definitely appears that the section of the statute just quoted was patterned after the Federal Employers' Liability Act. 45 USCA, § 51 St. Rep. . . . Therefore, the rule of construction promulgated by the federal courts should be given great weight in construing the provisions thereof."

We did not *incorporate* the Nevada statute into the body of our law. Rather, we enacted similar legislation upon a related subject, with two material distinctions: Before the Nevada statute can be invoked, separation must have continued for five years. In Arkansas the period is three years. But more important than the element of time—and going directly to a matter of fundamental consideration—is the direction in act 167 that the chancery court *shall* grant an absolute divorce at the suit of either party; whereas, in Nevada, the statute merely confers jurisdiction. If literally applied as appellee urges, our act of 1937 creates not only a cause, but it makes that cause absolute against the unoffending party—as conclusive and absolute as adultery, or any other established statutory ground.

Prior to adoption of the act in question, mere living apart, regardless of the length of time such separation may have continued, was not cause for divorce. In such case the decree was granted only at the instance of the spouse free from fault. One could not desert the other without legal cause and then obtain a divorce in reliance upon the separation.

So, in the case at bar, we are constrained to believe that, in spite of the affirmative words used in the matter added to the Digest, the direction to the chancery court to grant a divorce "at the suit of either party" . . . "when the husband and wife have lived apart for three consecutive years" must be treated as though the plural pronoun "they" had been used, and when so construed it would read: "When *they* have lived apart for three consecutive years." This contemplates an agreement or understanding between the parties that they will act in concert of purpose, voluntarily living apart for three years, or that no objection be interposed by the non-offending party.

Reversed, with directions to dismiss the complaint.

McHANEY and BAKER, JJ., dissent.

McHANEY, J., (dissenting). The late Chief Justice Hart would frequently say, in consultation, when the others were about to invade the province of the legislature: "Boys, if you are going to make a statute, make a darn good one." In my opinion the majority in this case have amended the statute so as to make it meaningless, and, instead of making a good one, have emasculated and destroyed whatever good there was in it. And this, too, because of the misconception that the statute was unwise or against some supposed public policy. I have always been of the opinion that the public policy of the state is declared by the Legislature, and that whether a given act of the legislature is wise or otherwise is a matter of no concern to the courts. And as said in *McClure* v. *Topf & Wright,* 112 Ark. 342, 166 S. W. 174, "it is not to be doubted that the legislature has the power to make the written laws of the state, unless it is expressly, or by necessary implication, prohibited from so doing by the Constitution." If the legislature has the power to make the written laws of the state, then the courts, under the guise of construction ought not to amend or change the meaning of an unambiguous statute.

The act of 1937, § 4381, Pope's Digest, provides an additional ground of divorce. It provides: "Seventh. Divorce from the bonds of matrimony may be obtained, in addition to the causes now provided by law, and subject to the same procedure and requirements, for the following cause: When the husband and wife have lived apart for three consecutive years without cohabitation the court shall grant an absolute decree of divorce at the suit of either party." While the act of 1937 re-enacted the whole of § 3500, Crawford & Moses' Digest, including the six grounds of divorce enumerated therein, the legislature evidently intended to enact a new and additional ground, else it would not have said, "in addition to the causes now provided by law." The above-quoted language of the statute is too plain for construction. It is clear and unambiguous. It simply

means what it says, that is, that either party may get a divorce from the other on allegation and proof that they have lived apart for three consecutive years without cohabitation. It is difficult to perceive how the legislature could have used simpler or plainer language. Yet the majority profess to have found it ambiguous and have amended it to read: "When *they* have lived apart for three consecutive years," and that "this contemplates an agreement or understanding between the parties that they will act in concert of purpose, voluntarily living apart for three years. At the end of such period either may obtain a divorce from the other by alleging and establishing mutuality of such separation." Just what the word "they" adds to this construction is difficult to understand, as it must refer to "husband and wife." And how the language of the act as changed "contemplates an agreement or understanding between the parties that they will act in concert of purpose, voluntarily living apart for three years" is not explained. It is just not in the act. The act does not say when the husband and wife (or "they") have lived apart for three consecutive years by consent, agreement or understanding between them. It does not say they must "act in concert of purpose" or "voluntarily." It simply says when they have done so no matter how. So it appears to me that the majority have amended the act so as to make it meaningless, and too in the very teeth of §4389 of Pope's Digest which provides: "If it shall appear to the court that the adultery, or other offense complained of, shall have been occasioned by the collusion of the parties, or done with the intent to procure a divorce, or that the complainant was consenting thereto, or that both parties have been guilty of the adultery, or such other offense or injury complained of in the bill, then no divorce shall be granted or decreed." This section was § 8 of chapter 51 of the Revised Statutes, and has been the law in this state since 1838, exactly 100 years, during all of which time it has been sustained and upheld in many cases. But it now appears to be no longer the law, but in effect has been abrogated by the majority opinion which holds that under the act of 1937.

a divorce may be obtained by collusion, consent, agreement or understanding, although the act itself says that the new ground of divorce shall be "subject to the same procedure and *requirements*" as now provided by law. One of the requirements then provided by law was that there should be no collusion, as provided in § 4389.

Another matter on which I disagree with the majority is the construction given the word "shall" in the clause of the act that "the court *shall* grant an absolute decree," etc. I think this word was used in the sense of "may", and that it was not the legislative intent to take away the discretion of the court. I do not think so, because, from a reading of the whole act, it is not borne out. Reading the whole of § 4381 of Pope's Digest, it will be seen that it begins by saying, "the chancery court *shall* have power to dissolve and set aside a marriage contract . . . for the following causes." It then enumerates seven grounds for divorce, and the seventh ground provides: "Divorce from the bonds *may be obtained,*" etc. So it will be seen that it was not the legislative intent, in the use of the word "shall", to take away the discretion of the court in the matter of granting or refusing to grant a decree of divorce. The word "shall" is frequently construed to be used in its permissive sense, just as the word "may" is frequently used in a mandatory sense. *Washington Co.* v. *Davis,* 162 Ark. 335, 258 S. W. 324; *Root* v. *O'Brien,* 164 Ark. 156, 261 S. W. 291; *Little River Co.* v. *Buron,* 165 Ark. 535, 265 S. W. 61; *Bush* v. *Martineau,* 174 Ark. 214, 295 S. W. 9; *Lybrand* v. *Wafford,* 174 Ark. 298, 296 S. W. 729; *Stranahan, Harris & Otis* v. *Van Buren Co.,* 175 Ark. 678, 300 S. W. 382.

Similar statutes have been passed in a number of other states, and the courts of those states have construed them in accordance with the plain, unambiguous meaning of the statute. The state of Nevada has a statute almost identical with ours. It reads as follows: "Section 1. Divorce from the bonds of matrimony may be obtained, in addition to the causes now provided by law, and subject to the same procedure and requirements, for the following cause:

"When the husband and wife have lived apart for *five* consecutive years without cohabitation, the court *may at its discretion* grant an absolute decree of divorce at the suit of either party." The only difference in our statute and the Nevada statute is in the words italicized in the Nevada statute. Our statute requires three years separation, whereas that requires five. Our statute uses the word "shall", whereas the Nevada statute uses the words "may at its discretion." If the word "shall" as used in our statute, should be construed as I think it should for the word "may", then there would be no difference between our statute and the Nevada statute, except the time required. Construing this statute, the Nevada court in *Herrick* v. *Herrick,* 55 Nev. 59, 25 Pac. 2d 378, used this language: "The legislative concept embodied in the statute is that when the conduct of parties in living apart over a long lapse of time without cohabitation has made it probable that they cannot live together in happiness, the best interest of the parties and of the state will be promoted by a divorce. The policy and purpose of such statutes are succinctly stated by the compiler of the note in 51 A. L. R. at p. 763, as follows: 'The public policy of these separation statutes is based upon the proposition that where a husband and wife have lived apart for a long period of time, without any intention ever to resume conjugal relations, the best interests of society and the parties themselves will be promoted by a dissolution of the marital bond. This is a comparatively new idea in the law of domestic relations and divorce.' "

Rhode Island has a statute requiring ten years separation and in *Guillot* v. *Guillot,* 42 R. I. 230, 106 Atl. 801, the court held that the granting of a divorce under that statute does not depend upon the previous conduct of the petitioning party, and that while testimony of a recriminating character may be admitted, it should not be binding upon or control the action of the court, but may be considered by way of aiding the court in the exercise of its discretion.

The state of Louisiana has a similar statute and in *Goudeau* v. *Goudeau,* 146 La. 742, 84 So. 339, the court

said: "One defense is that the plaintiff wife cannot avail herself of this law because the separation is wholly attributable to her, she having refused to live with defendant, although he was anxious that she should do so. This defense is without merit. Said statute does not require that the plaintiff spouse should be without fault." See, also, *Hava* v. *Chavigny,* 143 La. 365, 78 So. (La.) 594.

Kentucky has a similar statute which provides as a cause for divorce the "living apart without any cohabitation for five consecutive years next before the application." In the case of *Best* v. *Best,* 218 Ky. 648, 291 S. W. 1032, the wife answered that the separation for which the husband brought his suit for divorce was caused by his crual and inhuman treatment. In answer to that contention the court said: "But, if that were true, it would not defeat the particular statutory ground, since it is available regardless of the fault of the parties or either of them causing the separation."

The state of Washington has a similar statute which provides that the injured party may obtain the divorce and the court construed its statute to apply only to the obtaining of the divorce by the injured party, in *Pierce* v. *Pierce,* 120 Wash. 411, 208 Pac. 49. See, also, *Cook* v. *Cook,* 164 N. C. 272, 80 S. E. 178, 49 L. R. A., N. S., 1034.

Since our statute appears to have been adopted from the Nevada statute, the construction placed upon the Nevada statute by the Nevada court is presumed to have been adopted with it, and should be followed by this court. *White* v. *Taylor,* 187 Ark. 1, 58 S. W. 2d 210; *Beaty* v. *Humphrey, State Auditor,* 195 Ark. 1008, 115 S. W. 2d 559.

The only decision that appears to be in any way out of line with all of the other states having similar statutes is the case of *Pierce* v. *Pierce, supra,* but the decision in that case was based upon the peculiar language used in the statute of that state. All of the other decisions on related statutes are to the effect as said in *North* v. *North,* 113 So. (La.) 852: "The act under

which this suit is brought introduced a new and independent cause for divorce in this state, and that act does not take into consideration the question of what cause produced the separation or on whose fault the separation was brought about. The only requirement of the statute as a condition precedent to granting the divorce is that the parties have actually and in fact lived separate and apart and in different domiciles for a period of seven years complete . . ."

The second ground of our divorce statute provides that a divorce may be obtained "where either party willfully absents himself or herself from the other for a space of one year without a reasonable cause." Under this provision, the injured party may get a divorce on the ground of willful desertion for one year only. Certainly the Legislature, by adding the seventh ground of divorce, the ground now under consideration, intended to add a new ground of divorce without taking into consideration who was at fault in the original separation. Under that second ground, this court held in *Reed* v. *Reed*, 62 Ark. 611, 37 S. W. 230, that a separation by consent is not a willful desertion. In the case at bar, it is undisputed that the parties had lived apart for more than three years before this suit was brought, without cohabitation. On this ground the court granted a decree of divorce and I am of the opinion that his act in doing so should be affirmed.

I, therefore, respectfully dissent from the opinion of the majority and I am authorized to say that Mr. Justice BAKER and Mr. Justice DONHAM concur in this dissent.